Filed 4/8/13  P. v. Kovac CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C062955 |
| Plaintiff and Respondent, | (Super. Ct. No. 07F04046) |
| v. | |
| BENNETT LOUIS KOVAC, | |
| Defendant and Appellant. | |

Defendant Bennett Louis Kovac and Wayne Caskey murdered Gary Brooks in his shop in south Sacramento at about 3:24 a.m. on June 11, 2006.  Convicted of first degree murder with an arming enhancement and sentenced to state prison for an indeterminate term of 25 years to life plus one year for the arming enhancement, defendant appeals.  He contends:  (1) the evidence was insufficient to convict him, (2) the court erred by excluding evidence of third party culpability and not giving pinpoint third party culpability instructions, (3) the court erred by denying defendant's motion for mistrial based on juror misconduct, and (4) trial counsel was constitutionally deficient.  Finding no prejudicial error, we affirm.

1

## BACKGROUND

We need not recount the evidence here because we do so below in response to defendant's contentions that the evidence was insufficient to support the murder conviction and the trial court erred with respect to evidence of possible third party liability.

The district attorney charged defendant by information with murder (Pen. Code, § 187, subd. (a)) and alleged that a principal was armed during the crime (Pen. Code, § 12022, subd. (a)(1)).

Caskey and defendant were tried together but with separate juries. Caskey's jury convicted him of first degree murder and found that he personally discharged a firearm resulting in death. Defendant's jury, however, could not reach a verdict, so the court declared a mistrial.

Defendant was tried by a second jury, which found defendant guilty of first degree murder and found that a principal was armed during the crime.

The trial court sentenced defendant to state prison for an indeterminate term of 25 years to life, with an additional one year for the arming enhancement.

## DISCUSSION

### I

### *Sufficiency of Evidence*

Defendant contends that the evidence was insufficient to support his first degree murder conviction for aiding and abetting Caskey. The contention is without merit.

The court properly instructed the jury on principles related to murder liability both as the direct perpetrator and as an aider and abettor. Concerning the firearm enhancement, the court instructed the jury to find the allegation true if one of the principals was armed with a firearm in the commission of the crime. As noted above, the jury convicted defendant of first degree murder, with an enhancement that a principal was armed with a firearm.

Defendant contends that the evidence was insufficient to convict him of aiding and abetting first degree murder. He argues there was insufficient evidence that: (1) he knew of Caskey's intent to commit the crime and intended to aid that plan and (2) he was involved at all in the crime.

A.    *Aiding and Abetting Evidence*

This is a circumstantial evidence case. "Our task is clear. 'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible, and of solid value – from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" [Citation.]' [Citations.] The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 507-508.)

"[P]roof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus – a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea – knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus – conduct by the aider and abettor that in fact assists the achievement of the crime. [Citation.]" (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.)

3

Here, as we discuss in detail below, the evidence showed that (1) Caskey had an argument with Brooks on the day before the murder, during which Caskey fired a handgun into a door to intimidate Brooks, (2) Caskey and defendant are close friends, even referring to each other as brothers, (3) about 30 minutes before the murder, which other evidence established occurred at about 3:24 a.m., defendant was at an AM/PM gas station with his light colored sport utility vehicle (SUV) within one mile of Brooks's shop, (4) defendant's SUV drove to Brooks's shop minutes before the murder, (5) two big men fitting the description of Caskey and defendant were seen with masks on and armed with rifles, (6) witnesses heard gunshots at the time Caskey and defendant were at the shop, and (7) in the minutes after the murder, the cell phones of Caskey and defendant moved away from the murder scene. We discuss below each of these facts and how the jury could have drawn inferences that defendant was guilty.[1]

Defendant contends that mere presence at the scene of a crime is not sufficient to establish aider and abettor liability. (*In re Michael T.* (1978) 84 Cal.App.3d 907, 911.) He is correct, but here there was evidence of more than mere presence. As noted, a witness saw two big men fitting the descriptions of Caskey and defendant by Brooks's

---

[1] The Attorney General essentially abdicated her role as counsel for a party to these proceedings on this sufficiency of evidence issue. Responding to the insufficiency argument, which extended 27 pages in the appellant's opening brief and included numerous arguments concerning specific evidence, the Attorney General provided a little more than one page summarizing the evidence, without addressing defendant's specific arguments about the evidence. The Attorney General did this after we struck her first brief and directed her to file a new brief. We stated: "The Attorney General is directed to serve and file a respondent's brief, responding in detail to the appellant's opening brief . . . ." Because we cannot reverse unless there is a miscarriage of justice (Cal. Const., art. VI, § 13), we cannot deem the Attorney General's minimal treatment of defendant's arguments a concession of their merit. Nonetheless, the Attorney General's failure to respond appropriately in this case is unacceptable.

shop at the time of the murder. Both men were armed with rifles. Gunshots were heard, and one of assailants shot at the witness.

In summary, reasonable inferences drawn from the circumstantial evidence established that (1) defendant and Caskey, who were like brothers, (2) went to Brooks's shop in defendant's SUV, (3) disguised and armed themselves, (4) went into Brooks's shop, (5) shot him, and (6) fled. Under these facts, defendant was either the actual perpetrator or aided and abetted Caskey, as the jury could reasonably conclude that the two assailants entered the shop with the same intent to kill Brooks and carried out that intent together. (*People v. Perez, supra*, 35 Cal.4th at p. 1225.)

B.     *Defendant's Contentions as to Specific Evidence*

1.     Argument Between Caskey and Brooks

Referring to possible motive evidence, the prosecutor argued that Caskey and Brooks were involved in a dispute and someone shot two holes in the shop door on June 10, 2006. Defendant, however, claims that there is no evidence that there was a dispute between Caskey and Brooks on that occasion. He argues there is no evidence of a dispute or that the discussion was heated at all. The reasonable inferences drawn from the evidence suggest otherwise.

On the evening of June 10, 2006, several people were at Don Newcomb's shop, in the same block as Brooks's shop, loading a welder into Caskey's Ford Bronco. While the welder was being loaded into the Bronco, Caskey showed Kenwood Massey that he had Newcomb's .45-caliber handgun. Caskey put the handgun in the back waistband of his pants. As Brooks was tying down the welder, witnesses saw Brooks and Caskey conversing. It was a serious discussion, but the witnesses did not know what Brooks and Caskey were discussing and did not hear any yelling or screaming. They were standing face to face, less than a foot from each other, and Brooks had, in the words of a witness, "kind of like a smart remark on his face the whole time." One of the witnesses, Francisco Lopez, saw Caskey circle around the Bronco. Lopez heard two shots and saw two holes

5

in the roll-up door of the shop. Caskey circled back around the Bronco and continued his discussion with Brooks, again close to each other. Brooks again had a sarcastic look on his face. Lopez did not see a gun, and he could not see Caskey when Caskey was on the other side of the Bronco. Two expended .45-caliber shell casings were found near Newcomb's shop, and Newcomb noticed later that his .45-caliber handgun was missing.

Defendant argues that this evidence did not establish a motive for Caskey and defendant to kill Brooks. While motive is not an element of murder (see *People v. McKinzie* (2012) 54 Cal.4th 1302, 1357 [motive not an element of crime, though it may tend to prove guilt]), the inferences to be drawn from the incident are that the discussion between Brooks and Caskey was not friendly, Caskey fired shots into the shop door to intimidate Brooks, and there was some kind of bad blood between them.

2.      Friendship Between Caskey and Defendant

Defendant does not dispute that he and Caskey were close friends who spoke often and even, at times, referred to each other as brothers. However, he claims that "[t]he State asked the jury to use the fact of their close friendship as a critical link in the chain to the conclusion that [defendant] naturally must have aided and abetted Caskey." We find this prosecutorial argument unremarkable, and certainly not improper.

Defendant continues: "While no one disputes the fact that Caskey and [defendant] were good friends, the State asked the jury to take an enormous speculative leap to conclude that their closeness *necessarily* meant that [defendant] would willingly assist Caskey in the commission of a murder of someone [defendant] did not even know." (Original italics.) Again, using the close relationship between Caskey and defendant to establish a possible link between defendant and the murder is unremarkable. Furthermore, their close relationship was not the only evidence linking defendant to the murder. Accordingly, we see no logical problem with this argument by the prosecutor.

### 3. Singh's Description of Assailants

Defendant next attacks the testimony of Vimal Singh that (1) he drove up to Brooks's shop around the time of the murder, (2) he was shot at by the assailants, and (3) the assailants were big men, who fit the description of Caskey and defendant. Singh refused to testify in defendant's second trial, so his testimony from the first trial was read to the jury. On appeal, defendant argues that Singh's testimony could not establish that defendant was at the scene of the murder. While there were ways to impeach Singh's credibility concerning the identification, that was a jury question, and on our sufficiency of evidence review we find no reason to reject the jury's implicit determination that Singh's identification was accurate.

Defendant and Caskey are both big men. Caskey, known as Fat Man, is five feet, eleven inches tall and, at the time of the murder, weighed 225 pounds, and defendant is six feet, one inch tall and weighed 250 pounds, as the jury would have been able to see.

Singh, who is Fijian of Indian descent, and is about five feet, two inches tall and, at the time of the murder, weighed approximately 115 pounds, testified that he went to Brooks's shop in the early morning hours of June 11, 2006, to smoke methamphetamine with Brooks. While Singh was with Brooks, two other Fijians of Indian descent, Aman Kumar and Avneal Datt came into the shop. Singh testified that these other two Fijians "weren't big. Skinny." They were about five feet, five inches to five feet, seven inches. After being in the shop 30 to 45 minutes, Singh left to go looking for wood pallets and catalytic converters to steal.

After between 20 and 40 minutes of looking for wooden pallets and catalytic converters, Singh returned to Brooks's shop at about 3:25 a.m., wanting to smoke more methamphetamine. He did not see the car that the other Fijians arrived in. He saw another vehicle that had its lights on parked near Brooks's shop. He testified that he may have told an investigator later that it was a silver SUV. It was newer and was possibly a Chevrolet, Ford, or Nissan. He did not recognize the vehicle, so he was curious about

7

who was in it. He passed Brooks's shop and the SUV and parked in front of the SUV. When the SUV turned its headlights on, Singh made a U-turn and parked closer to Brooks's shop.

Staying in his truck, Singh saw two people with rifles hunched down, by the gate into Brooks's shop. One was wearing a nylon stocking over his head, and the other was wearing a white mask. The two people were big, but Singh could not estimate their height because they were hunched down. Singh had seen a similar mask at the home of the Luper brothers – the men who had introduced him to Brooks. Singh also said that the two men were comparable in size to the Lupers, who are over six feet tall and weigh about 240 pounds. When Singh saw the men, they were about 38 feet away. And he was watching them in his driver's side-view mirror.

Singh lost sight of the men as they went in the direction of Brooks's shop. After a short period of time, Singh heard a shot, and then after another short period of time, another shot. Within a short period of time, the man with the stocking mask came out of the shop and made eye contact with Singh. The man raised his rifle and pointed it at Singh. Singh started his truck, ducked down, and drove away. The man shot at Singh four or five times. One of Singh's tires went flat, and he eventually stopped, left his truck, and hid under some trailers.

Referring to this testimony, defendant argues on appeal that it could not contribute to the identification of defendant as one of the assailants because (1) it was imprecise concerning the size of the assailants, (2) Singh had been using methamphetamine that night, (3) it was dark, and (4) he made the observations through his driver's side-view mirror. But these were all arguments for the jury. The testimony was not so incredible that the jury could not consider it.

Defendant also argues that Singh's credibility was suspect because Singh refused to testify in the second trial and, therefore, the jury could not see defense counsel's cross-

8

examination. Again, these are arguments to be made to a jury; they do not require that we reject Singh's testimony on appeal.

### 4. Cell Phone Records

Cell phone records of a phone commonly used by defendant showed that the phone was in the vicinity of the murder scene at the time of the murder and moved away from the scene in the minutes after the murder. This was part of the prosecution's case to show that defendant was involved in the murder.

On appeal, defendant claims that the cell phone evidence did not support the inference that he was in the vicinity of the murder scene or that he was leaving the area after the murder. We conclude that the evidence, viewed in the light most favorable to the verdict and in conjunction with the other evidence of defendant's participation in the murder, reasonably supports an inference that defendant was in the vicinity of the murder scene at the time of the murder and shortly thereafter left the area.

A security guard working for a company down the street from Brooks's shop heard gunfire that he testified occurred at 3:24 the morning of the murder. Two calls were made to a phone commonly used by defendant (ending in 5327) around that time. Although no one answered the phone, cell phone records identified the location of defendant's phone when each call was made. Cell phone records also identified the location of a phone commonly used by Caskey (ending in 5347) during approximately the same time frame and placed Caskey's phone near defendant's phone. The evidence establishing the approximate location of the cell phones came from cell phone records and the testimony of Joseph Kurtz, an engineer who works for MetroPCS, a cell phone company.

Kurtz testified concerning the calls made to defendant's number. At 3:28 and 12 seconds in the morning of June 11, 2006, defendant's phone received a call within blocks of Brooks's shop, where a vehicle would be if it was heading away from Brooks's shop toward Franklin Boulevard and Highway 99. That call connected to defendant's cell

9

phone at cell tower number 357. At 3:30 and 47 seconds (two minutes, 35 seconds after the first call), another call connected to defendant's phone at tower 47, which is about 2.5 miles north of tower 357, along Highway 99.

Caskey's cell phone connected to cell tower 357 at 3:27 and two seconds, about one minute before defendant's cell phone connected to the same tower. At 3:30 and 44 seconds, three seconds before the second phone call to defendant's phone, Caskey's cell phone connected to cell tower 102, which is just north of cell tower 47.

Because Caskey's cell phone connected to cell tower 102 and then, three seconds later, defendant's cell phone connected to cell tower 47, which is south of cell tower 102, defendant asserts that this necessarily shows that the phones were traveling south, toward the murder scene, not north and away from the murder scene.

That is not necessarily true because, according to Kurtz's testimony, cell phones take into consideration not only the strength of the signal and the proximity of the cell tower when selecting a cell tower to connect to but also figure in signal interference or noise ratio. Kurtz testified that two calls made 100 feet apart could attach to separate cell towers. Furthermore, when a cell phone connects to a cell tower, it does not always connect to the tower with the strongest signal because signal interference or noise ratio figures into the cell phone's selection of a cell tower. The trial exhibits created by Kurtz for trial, however, showed only the strongest signal for a cell tower in each area and did not factor in signal interference and noise ratio. Taking all of Kurtz's testimony into account, two cell phones traveling together north on Highway 99 could have connected to separate cell towers for calls received just three seconds apart.

The cell phone evidence allowed the jury to infer that defendant and Caskey, together, traveled away from the murder scene shortly after the murder. A guard heard a gunshot at 3:24 a.m. And the cell phones records showed both defendant's and Caskey's cell phones traveling away from the scene in the minutes after the murder.

But defendant makes three arguments that the jury could not make this inference.

10

First, defendant argues that "the records establish that [defendant's] phone was not within the same cell tower region as the crime scene . . . ." That statement is incorrect. The cell phone records do not establish where the cell phone was at 3:24 a.m. because there was no call coming in or going out at that time. Therefore, the records did not establish that defendant's phone was not at the murder scene.

Second, defendant argues that the evidence does not support an inference that defendant and Caskey were moving away from the crime scene together. He cites the fact, discussed above, that their cell phones activated separate towers "at virtually the same time." "Virtually," however, means not exactly. The difference was three seconds, and a vehicle traveling up Highway 99 could cover substantial ground in three seconds at the early morning hour when there would be little traffic.

And third, defendant argues that the jury could not infer that he was at the crime scene because he did not answer the calls on his cell phone during the minutes after the murder. That is nothing more than an argument for the jury, which it apparently did not accept. The jury, considering all the evidence, reasonably inferred that defendant's cell phone was with defendant, whether or not he answered it.

Defendant also argues that the cell phone records "at most could only place [defendant's] phone somewhere near the scene, which is not sufficient to find aiding and abetting liability." This is an argument we need not answer on these terms because the cell phone records were just one piece in a mosaic of evidence that constituted sufficient evidence that defendant aided and abetted in Brooks's murder. Therefore, we need not determine whether the cell phone records, by themselves, were sufficient evidence to support the conviction.

> 5. Videos of Defendant's SUV

Defendant had a light colored GMC Denali (an SUV) at the time of the murder. From the trial exhibits, it appears to be silver or gray. The prosecution presented two videos, which the prosecution argued showed defendant's SUV (1) at a gas station

11

(AM/PM) less than a mile from Brooks's shop within about 30 minutes before the murder and (2) traveling on the street leading to Brooks's shop within minutes of the murder as recorded by a security camera of a business (United States Cold Storage) down the street from Brooks's shop.

### a. AM/PM Video

The prosecution introduced evidence that, at 3:01 a.m. on the morning of the murder, a light colored SUV resembling defendant's stopped for gas at an AM/PM station less than a mile from the murder scene. A man who generally fits the description of defendant is also seen in the video. He approaches the pay station from the direction of the SUV and moments later appears to be returning to the SUV. The images are low resolution, so they appear blurry.

On appeal, defendant argues that the AM/PM video does not support the conviction. He claims that "there is no indication that the man seen on the video is [him]" and that "there is no reasonable inference that the SUV in the video is [his] Denali." To the contrary, although the images are blurry, they show a man who generally fits defendant's description who appears to be associated with an SUV that generally fits the description of defendant's SUV. Defendant's arguments that the images are not clear enough to establish that they depicted him and his Denali were arguments for the jury. On our review, they contribute to the evidence needed to sustain a conviction.

### b. Cold Storage Video

United States Cold Storage is a business located across the street from Brooks's shop on 52nd Avenue in Sacramento. A Cold Storage surveillance camera takes video of a gate leading out of Cold Storage property onto 52nd Avenue. Although Cold Storage's building is directly across the street from Brooks's shop, the gate is an exit from Cold Storage's parking lot down the street from Brooks's shop, toward Franklin Boulevard. On the morning of the murder, the camera took video of vehicles passing by the gate on 52nd Avenue.

12

At 3:18 a.m., according to the time stamp on the video, at light colored SUV resembling defendant's SUV is seen passing by the gate in the direction of Brooks's shop.

At 3:22 a.m., the light colored SUV is again seen passing by the gate in the direction of Brooks's shop.

At 3:25 a.m., a white pickup truck with a load in the back is seen passing by the gate in the direction of Brooks's shop.

At 3:31 a.m., the white pickup truck is seen passing by the gate going away from Brooks's shop.

The video, taken in the dark morning hours, is low resolution. However, it shows vehicles passing by, illuminated somewhat by street lights. No drivers or passengers are visible.

The video places an SUV like defendant's in the area of Brooks's shop near the time of the murder. It also corroborates Singh testimony about being at Brooks's shop in his white pickup truck around the time of the murder and fleeing soon after.

On appeal, defendant argues that the SUV captured on video is not his and the testimony about the time stamp on the video establishes that it was not taken around the time of the murder. Neither argument has merit.

Defendant claims that the SUV in the video cannot be his because his SUV has a luggage rack and the SUV in the video does not. While this is an argument defendant could have made to the jury, the video does not necessarily establish that the SUV passing by did not have a luggage rack. The only lighting in the video is street lighting. Therefore, at times the light glares off the light colored SUV and at other times the SUV is barely illuminated. Although no luggage rack is clearly visible, the poor lighting conditions preclude a definitive observation concerning whether there was a luggage rack.

Defendant also claims that the times stamped on the video make it impossible that defendant could have been at the murder scene at the time of the murder. The time stamp on the video was keyed to the clock in Cold Storage's computer. The video showed that the SUV passed by at 3:18 a.m. and 3:22 a.m., both times going toward Brooks's shop. However, the clock in Cold Storage's computer may not have been synchronized with the clock used by the security guard to note the time of the gunshots or the clock used to time stamp the cell phone records. In any event, even if the clocks were not synchronized, there is no reason to believe they were so far out of sync to bring into question whether defendant's SUV passed by at a time that would have permitted him and Caskey to commit the murder.

Defendant focuses on testimony by the owner of the company that provided the security camera to Cold Storage that he did not know whether the internal clock was accurate and testimony of a sheriff's deputy that the Cold Storage video may have been 10 to 15 minutes off, comparing it to the time on his watch. These were certainly matters to bring to the attention of the jury; however, on sufficiency of evidence review, we construe the evidence in the light most favorable to the verdict. So viewed, the testimony of the security guard, the cell phone records, the AM/PM footage, and the Cold Storage video, along with the evidence concerning defendant's SUV and his appearance, were sufficient for the jury to conclude that defendant was at the scene of the murder.

6. Wiretapped Calls

Finally, defendant argues that transcripts of calls to and from defendant's and Caskey's cell phones recorded by law enforcement are insufficient to establish defendant's guilt. We need not recount the calls in detail. Suffice it to say, defendant and Caskey, though never admitting during these calls that they committed the murder, discussed what they had said and would say to authorities investigating the crime. Defendant also voiced consternation that the authorities were asking him questions about the murder. Contrary to defendant's claim on appeal, these are circumstances that tend to

14

show consciousness of guilt. It supported the verdict, even though it was insufficient by itself to constitute substantial evidence of guilt.

C. *Conclusion*

Defendant argues that, considering all of these asserted problems with the evidence together, the "evidence does not support any reasonable conclusion that [he] aided and abetted in Brooks'[s] murder . . . ." We disagree. Construing the evidence in the light most favorable to the verdict, the evidence, along with reasonable inferences drawn from the evidence, are sufficient to support the jury's verdict. Defendant and Caskey, armed and disguised, were at Brooks's shop; Brooks was murdered; and defendant and Caskey fled.**2**

II

*Evidence and Instructions Concerning Third Party Liability*

Defendant contends that the trial court made several rulings concerning evidence and instructions that prevented him from arguing that someone else killed Brooks. The contention is without merit.

A. *Exclusion of Hayer's Pregnancy*

Defendant argues that the trial court abused its discretion by excluding evidence that Jaspreet Hayer was pregnant by Brooks at the time of Brooks's murder. The potential relevance of this evidence was that Don Newcomb, who operated an auto body shop close to Brooks's shop, was also dating Hayer at the time and, therefore, may have had a motive to kill Brooks. We conclude the trial court did not abuse its discretion in

---

**2** We discuss additional evidence concerning possible third party liability in the next part of this opinion. While such evidence was introduced at trial, it was not of a nature so compelling that the jury could not draw the inferences discussed above of defendant's guilt.

15

excluding the evidence of Hayer's pregnancy because there was no evidence that Newcomb knew about the pregnancy at the time of Brooks's murder.

### 1. Factual Background

The trial court held an Evidence Code section 402 hearing to consider whether to admit the evidence that Hayer was pregnant when Brooks was killed. At the time Brooks died, Hayer was about five and a half months pregnant. She did not believe at the time that she was pregnant and had been in denial about the pregnancy because, even at that late stage, she was not showing. She had been romantically involved with both Brooks and Newcomb, and she testified that she believed Brooks was the father. She never told either of them that she was pregnant. In fact, before Brooks's death, she did not tell anyone she was pregnant. Some suspected that she was pregnant because she was constantly sick. Both Brooks and Newcomb wanted to marry her. Newcomb knew about Hayer's relationship with Brooks, but Brooks did not know about her relationship with Newcomb.

After the evidentiary hearing, the trial court ruled, preliminarily, that evidence of Hayer's pregnancy was inadmissible because there was no evidence Newcomb knew she was pregnant. However, the court stated that the defense could raise the issue again in trial.

At trial, Hayer testified that on the evening before Brooks's murder she and Newcomb drove around for about two hours and then she spent the night with Newcomb in Newcomb's shop, in the same block as Brooks's shop. Starting at about 2:40 a.m., she took a 30-minute shower. Ten minutes after she got out of the shower, around 3:20 a.m., Newcomb, who had been outside, came into the shop. Newcomb told Hayer he had heard gunshots, and Newcomb was acting strange – nervous and crying – like the gunshots had scared him.

Newcomb then went outside for five to fifteen minutes. While he was gone, Hayer heard gunshots. Newcomb returned with a calmer demeanor, and, when Hayer

16

asked about the gunshots, Newcomb said she was hearing things. Newcomb did some laundry then went to sleep. When Newcomb came in the first time, he was wearing a black, long-sleeved shirt. But when he came in the second time, he was wearing a white T-shirt.

Near the end of trial, defense counsel again sought to admit the evidence of Hayer's pregnancy. The defense argued that Newcomb must have known about the pregnancy, even though the evidence was that Hayer did not tell him, because others seemed to have noticed that Hayer was pregnant. Counsel argued: "Presumably [Newcomb] would have noticed the morning sickness, the gaining of weight, things along those lines. His denial of knowledge we submit is not credible, but in any event, it is a matter for the jury to decide."

The trial court again ruled against admission of the evidence that Hayer was pregnant because there was insufficient evidence that Newcomb knew this fact. And even if Newcomb knew that Hayer was pregnant, there was no evidence that he knew Brooks was the father, not he. The court also ruled that the evidence was inadmissible under Evidence Code section 352 because the evidence, such as it was, had little probative value.

Later, the trial court held that there was sufficient evidence to give a third party culpability instruction specifically as to Newcomb. The court commented: "I think there is evidence . . . . I don't find it credible, but nonetheless I think there's sufficient evidence for the defense to argue that [Newcomb] had motive, anger over the girlfriend; numerous witnesses have testified to the relationships, testimony about tensions, jealousy, etcetera. Opportunity is clear, he's present, he's physically at the scene."

2.      Analysis

We review the trial court's decision to admit or exclude evidence under the deferential abuse of discretion standard. (*People v. Vieira* (2005) 35 Cal.4th 264, 292.) Under this standard, a trial court's ruling will not be disturbed, and reversal of the

17

judgment is not required, unless the exercise of discretion is arbitrary, capricious, or patently absurd, and results in a miscarriage of justice. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113, overruled on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

"Any relevant evidence that raises a reasonable doubt as to a defendant's guilt, 'including evidence tending to show that a party other than the defendant committed the offense charged,' is admissible. [Citations.] But 'evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.' [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 577-578.)

Here, the trial court allowed the defense to introduce evidence concerning Hayer's simultaneous relationship with both Brooks and Newcomb. It also allowed the defense to argue to the jury that Newcomb may have killed Brooks and instructed the jury on third party liability as to Newcomb. Exclusion of evidence that, at the time of Brooks's murder, Hayer was pregnant was not an abuse of discretion because there was no substantial evidence that Newcomb knew that Hayer was pregnant. Defendant would have us speculate that Newcomb may have known, but there is simply no evidence upon which the jury could reasonably rely to infer that Newcomb knew about Hayer's pregnancy. Since there was insufficient evidence to establish that knowledge, which was the only relevance Hayer's pregnancy may have had to this case, exclusion of the evidence was not an abuse of discretion.

B.      *Failure to Instruct Concerning Datt and Kumar and the Lupers*

Defendant contends that the trial court erred by refusing to instruct on third party culpability specifically as to Aman Kumar and Avneal Datt and as to Jason and John Luper. We conclude the refusal to give these pinpoint instructions concerning third party culpability did not prejudice defendant.

18

A trial court may instruct the jury with a pinpoint instruction on third party culpability. However, such instructions add little to the standard instruction on reasonable doubt. Therefore, refusal to provide pinpoint instructions on third party culpability "is not prejudicial because the reasonable doubt instructions give defendants ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof. [Citations.]" (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1277.)

### 1. Datt and Kumar

On the day before the murder, Datt and Kumar were seen in Brooks's shop, apparently looking for something. Singh testified that, before the murder, Datt and Kumar, who both had slim builds, were at Brooks's shop. Datt was wearing a dark sweatshirt and brown pants, the same combination Singh had said was worn by one of the masked assailants. However, when Singh returned to the shop at the time of the murder, the vehicle Datt and Kumar had arrived in was gone. Datt and Kumar returned to the shop later in the morning, and were seen there by another witness. She testified that they were surprised to see her and quickly left, claiming that they had not seen Brooks. Soon after Brooks's murder, Kumar left the country.

### 2. Jason and John Luper

A pair of brothers identified as Jason and John Luper knew both Singh and Brooks. Singh testified that the masked assailants were of the same stature as the Lupers. He also testified that one of the assailants wore a mask identical to a mask Singh had seen at the Lupers' house.

### 3. Analysis

Relying on *People v. Gonzales, supra,* 54 Cal.4th at 1277, we conclude that the absence of a third party culpability instruction specifically referencing Datt and Kumar or the Lupers was not prejudicial to defendant. The reasonable doubt instruction gave

19

defendant ample opportunity to argue to the jury that someone else committed the murder. (*Ibid.*)

Defendant argues that failing to give a pinpoint, third party culpability instruction as to Datt and Kumar and the Lupers was prejudicial because the court gave such an instruction with respect to Don Newcomb. We disagree. The jury had well in mind the fact that evidence of third party culpability could raise a reasonable doubt as to defendant's guilt. Accordingly, there was no prejudice.

Defendant also argues that failure to provide the pinpoint, third party culpability instruction with respect to Datt and Kumar violated what defendant calls the "*Hall* rule." However, that case, *People v. Hall* (1986) 41 Cal.3d 826, examined whether a trial court abused its discretion by excluding third party culpability evidence. That is a very different question from whether the trial court is required to provide a pinpoint instruction.

And finally, defendant argues that "the defense was not permitted to argue Datt's and Kumar's potential guilt." That is true only to the extent that the court added that "you can't say that there's evidence that they committed the crime." In other words, the trial court limited defense argument to the evidence at trial.[3]

C.     *Exclusion of Evidence Concerning Louie*

Hayer testified at the Evidence Code section 402 hearing concerning a man named Louie who was after her for cheating him on a drug deal. Hayer avoided Louie who was

---

[3]     At the end of his argument that the trial court erred by refusing to provide a pinpoint, third party culpability instruction as to Datt and Kumar, defendant contends that the trial court erred by excluding evidence that marijuana was found in a search of Brooks's shop. Defendant speculates that Datt and Kumar may have been looking for the marijuana the day before the murder and when they returned to Brooks's shop after the murder. We need not consider this contention because defendant failed to make it under a separate heading and failed to provide authority to support the contention. (Cal. Rules of Court, rule 8.204(a)(1)(B); *People v. Roscoe* (2008) 169 Cal.App.4th 829, 840.)

looking for her, and, on one occasion when Hayer was hiding in Brooks's shop, Brooks told Louie to go away. Louie said that someone had to make it right.

The trial court excluded evidence about Louie because there was insufficient evidence that Louie killed Brooks and because it had little probative value and would confuse the jury. (*People v. Hall, supra,* 41 Cal.3d 826.)

"The 'determination as to whether the probative value of such evidence is substantially outweighed by the possibility of . . . unfair prejudice or misleading the jury is "entrusted to the sound discretion of the trial judge who is the best position to evaluate the evidence." [Citation.]' [Citation.] We review rulings under [Evidence Code] section 352 for abuse of discretion. [Citation.] 'A trial court's exercise of its discretion under [Evidence Code] section 352 " 'must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' [Citation.]" (*People v. Hernandez* (2011) 200 Cal.App.4th 953, 966.)

The trial court here did not abuse its discretion under Evidence Code section 352. The evidence concerning Louie had very little, if any, probative value. Therefore, exclusion of the evidence was proper to avoid confusing or misleading the jury.

D.     *Admission of Prior Testimony*

As noted, Singh refused to testify in defendant's second trial, so the court admitted the transcript of his testimony in the first trial. Defendant contends: "Assuming for the sake of argument that the court's finding of unavailability was proper, the court abused its discretion in not excluding the evidence under [Evidence Code] Section 352."

Defendant asserts: "Singh's testimony was not probative to the case against [defendant], as it was so vague and marred by issues of perception; its prejudice to [defendant's] case, in contrast, was enormous." To the contrary, Singh's testimony was probative as he was at Brooks's shop at the time of Brooks's murder and his presence was corroborated by the Cold Storage video. Also, while the evidence may have been

21

important to the People's case, it was not prejudicial. The " 'prejudice' " referred to by Evidence Code section 352 does not refer to damage " 'that naturally flows from relevant, highly probative evidence' [citations]" (*People v. Zapien* (1993) 4 Cal.4th 929, 958), but instead to "evidence that poses an intolerable risk to the fairness of the proceedings or reliability of the outcome." (*People v. Booker* (2011) 51 Cal.4th 141, 188.) There was no such risk here.

Defendant's contention that the trial court should have excluded Singh's testimony is without merit.

E.     *Admission of Wiretapped Calls*

Defendant contends that the trial court abused its discretion by admitting the wiretapped calls from his and Caskey's cell phones eight to nine months after Brooks's murder during the investigation. He claims that the calls were "wholly irrelevant" and that they "do *not* reasonably support a conclusion that [he] had even been aware of Brooks'[s] murder before the police started questioning him about it many months later, but before the phone calls at issue were made." (Original italics.) We reject this contention because the wiretapped calls were relevant and, even assuming for the purpose of argument that they were irrelevant, defendant fails to establish prejudice.

An appellant who contends evidence was improperly admitted bears the burden of establishing both error and resulting prejudice. (*People v. Hill* (2011) 191 Cal.App.4th 1104, 1122.) Without such a showing, we cannot reverse. (Cal. Const., art. VI, § 13.)

Here, defendant makes no attempt to establish prejudice. Instead, he declares there was "extreme prejudice," and says no more on the matter. Because defendant does not establish prejudice, we cannot reverse regardless of whether the trial court improperly admitted the wiretapped calls. If, as defendant contends, the wiretapped calls were "wholly irrelevant" and failed to demonstrate a consciousness of guilt, they were not prejudicial.

22

In any event, the content of the wiretapped calls was sufficient for the prosecution to argue that they exhibited a consciousness of guilt. In the calls, defendant and Caskey discussed what they had said and would say to authorities investigating the crime. Defendant also voiced consternation that the authorities were asking him questions about the murder. Therefore, there was also no abuse of discretion in admitting the calls.

III

*Alleged Jury Misconduct*

Defendant contends that the trial court erred by denying his motion for mistrial based on juror misconduct. We conclude that the trial court did not err.

"An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is ' "capable and willing to decide the case solely on the evidence before it" ' [citations]." (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294.) When a trial court is aware of possible juror misconduct, the court must make whatever inquiry is reasonably necessary to resolve the matter. Although courts should promptly investigate allegations of juror misconduct, they have considerable discretion in determining how to conduct the investigation. (*People v. Prieto* (2003) 30 Cal.4th 226, 274.)

If there is jury misconduct, a presumption of prejudice arises. (*People v. Chavez* (1991) 231 Cal.App.3d 1471, 1484.) We review de novo the issue of whether prejudice arises from jury misconduct. (*People v. Nesler* (1997) 16 Cal.4th 561, 582, fn. 5.) "Any presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no substantial likelihood that one or more jurors were actually biased against the defendant. [Citations.]" (*In re Hamilton, supra*, 20 Cal.4th at p. 296, italics omitted.)

Here, some of the jurors committed misconduct by discussing the case outside the jury room. Several jurors went to lunch together after they had agreed on a verdict but

23

had not yet voted on the enhancement. They had not yet filled out the verdict forms. They discussed the absence of Caskey at the trial, and some said they would satisfy their curiosity on that topic after trial. The jurors also discussed another juror and how it had been difficult working with that juror. The jurors did not discuss the evidence at lunch.

The trial court questioned the jurors who had gone to lunch, but it did not question the juror about whom they had talked at lunch. The trial court concluded that there had been no misconduct because the jurors did not discuss the evidence, and, even if there was misconduct, there was no prejudice.

On appeal, defendant asserts that (1) the trial court erred by not interviewing the juror about whom the other jurors talked at lunch and (2) the misconduct was prejudicial.

On the issue of whether the trial court should have interviewed the juror about whom the other jurors talked at lunch, defendant offers neither reasoning nor authority. Seeing no obvious prejudice, we conclude defendant forfeited this argument by failing to support it. (Cal. Rules of Court, rule 8.204(a)(1)(B); *People v. Windham* (2006) 145 Cal.App.4th 881, 893, fn. 8.)

As for prejudice resulting from the misconduct committed when several jurors discussed the case outside the jury room, we agree with the trial court that there is no prejudice here. The jury had already concluded that defendant was guilty of murder, although they had not yet voted on the enhancement. The jurors at lunch did not discuss anything that would influence their proper deliberations. Therefore, the presumption of prejudice is rebutted because there is no reasonable probability that the misconduct affected the verdict. (*In re Hamilton, supra*, 20 Cal.4th at p. 296.)

The trial court did not err by denying the motion for mistrial.

IV

*Effective Assistance of Counsel*

Defendant contends that his trial counsel did not provide constitutionally adequate representation. The contention is without merit.

24

To demonstrate ineffective assistance of counsel, a defendant must show two things: deficient representation and prejudice resulting from the deficient representation. The standard for deficiency is that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. The standard for prejudice is that there is a reasonable probability the defendant would have obtained a better result absent the deficiency. (*People v. Avena* (1996) 13 Cal.4th 394, 418; *Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 693-694 [80 L.Ed.2d 674, 693-694, 697-698.) If there is no showing of prejudice, we need not examine counsel's performance. (*Strickland v. Washington, supra,* at p. 697.)

A.    *Failure to Object to Admission of Prior Testimony*

Defendant argues: "Counsel failed to object to the reading of Singh's testimony on the ground that any probative value was substantially outweighed by its prejudice and failed to appeal to the court's discretion to exclude the testimony, despite the finding of unavailability." He then explains why "these failures" were prejudicial.

This argument fails completely to assert that counsel's representation fell below a standard of reasonableness under prevailing professional norms. (See *People v. Avena, supra,* 13 Cal.4th at p. 418.) Merely stating that crucial prosecution evidence would have been excluded if the trial court had exercised its discretion as defendant now wishes it had establishes neither a standard of reasonableness nor representation falling below that standard. Since defendant does not establish that counsel's representation fell below the applicable standard, we need not consider prejudice. In any event, Singh's prior testimony was properly admitted.

B.    *Failure to Object to Admission of Wiretapped Calls*

Defendant argues: "Counsel failed to object to the admission of the wiretapped calls on the grounds that any probative value was substantially outweighed by prejudice, that they were irrelevant, and, as to some of the calls, that they were hearsay." He then argues that (1) the calls did not reflect consciousness of guilt and (2) admission of the

25

calls allowed the prosecution to argue that defendant's statements and adoptive admissions implied his participation in the murder.

Defendant's arguments are contradictory. He claims, in essence, that trial counsel should have objected to the evidence as irrelevant and prejudicial because it was too probative. The claim is without merit because the trial court would have properly denied any objection to this relevant and probative evidence.

C.      *Failure to Move to Dismiss After Prosecution Case*

Referring back to his sufficiency of evidence argument, defendant argues that trial counsel should have moved for dismissal at the end of the prosecution's case. (See Pen. Code, § 1118.1.) For the same reasons we reject the sufficiency of evidence argument, we reject this argument.

D.      *Failure to Proffer Evidence*

Defendant's appellate counsel produced new renderings of the evidence presented at trial and attempted to append those new renderings to the appellant's opening brief. We struck those new renderings from the brief. (See Cal. Rules of Court, rule 8.204(d) [limiting materials that may be attached to briefs].)

Relying on the new renderings, defendant argues that trial counsel's representation was deficient because he failed to produce evidence that the SUV depicted in the Cold Storage surveillance video was not defendant's. We reject this argument because it is based on evidence not properly in the record.

E.      *Failure to Attack Quality of Police Investigation*

Defendant contends that, if trial counsel had attacked the quality of the police investigation into the murder, "the jury would have realized the insufficiency of the evidence against [defendant], as well as the likelihood that the evidence pointed to other suspects." Defendant makes no attempt to support this contention and, indeed, would be unlikely to be able to support this contention, even had he tried, on this record.

26

Speculation about what a different defense strategy would have produced establishes neither incompetence nor prejudice.

F.   *Failure to Request Questioning of Juror*

And finally, defendant contends that trial counsel was constitutionally deficient because he did not request the trial court to question the juror about whom the other juror's had a lunchtime discussion.  Defendant speculates:  "Had trial counsel so requested, the court could have asked that juror whether he or she felt pressured by the others, and whether that impacted his or her own vote."  Aside from the fact that evidence of how conduct or statements in the jury room influenced a juror's mental processes is inadmissible to impeach the verdict (Evid. Code, § 1150), this speculative contention does not establish prejudice and is therefore without merit.

DISPOSITION

The judgment is affirmed.


                                        NICHOLSON            , J.



We concur:



      BLEASE        , Acting P. J.



      ROBIE        , J.



27